UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

FOURTH DIVISION

---

| | |
|---|---|
| Fairmont Taxpayers Coalition for Government Transparency, | Court File No. 23-cv-03667 |
| Plaintiff, | |
| vs. | |
| City of Fairmont, | |
| Defendant. | |

---

**COMPLAINT**

---

Plaintiff Fairmont Taxpayers Coalition for Government Transparency ("Taxpayers"), for its Complaint against Defendant City of Fairmont ("City") states and alleges as follows:

**The Parties**

1. This is an action raising issues with respect to a flawed referendum within the City of Fairmont to construct a Community Center (hereinafter "Project") based upon ambiguous, confusing and misleading terminology and other defects.

2. Plaintiff Taxpayers, an unincorporated association consisting of individuals who are residents of Fairmont or taxpayers there.

3. Defendant City is a municipal entity located in Martin County in the State of Minnesota.

1

4. This Court has jurisdiction over this matter because it raises questions under the laws of the Constitution of the United States, pursuant to 20 U.S.C. § 1331 and supplemental or ancillary jurisdiction under 28 U.S.C. § 1367 over the state law claims asserted in Counts II, III, and IV.

5. Venue is proper in this Court because the claims arise within the District of Minnesota.

## Background Facts

6. In 2016, prior to authorization by the state legislature, the City Council for the City of Fairmont ("City Council") enacted Resolution No. 2016-20 to place on the ballot a referendum for determination ("Referendum") by its citizens, of the imposition of a one-half cent local sales tax for a 25 year period in order to fund "recreational amenities, trails, *and* a Regional "Wellness Center" in order to satisfy the "need for Fairmont community recreational needs." (emphasis supplied)

7. In November 2016, the matter was placed on the ballot as City Question 1 for determination by the voters. The ballot proposition asked the citizens to approve imposition of a "local option sales tax of one-half of one percent (1/2%) for 25 years or until $15 million in revenues have been generated" and that the funding be used for the "purpose of funding recreational amenities, trails, *and/or* a Fairmont *Community Center*." (emphasis supplied).

8. As reflected in the change in wording, the original resolution, as approved by the City Council, was modified on the ballot referendum in three ways: (1) from a confusing conjunctive "and" to a conjunctive – disjunctive construct of "and/or"; (2) the

2

proposal was changed from a "Regional Wellness Center" to a "Community Center"; and (3) from a one-half cent tax to a one-half of one percent (1/2%) tax.

9. The voters approved the modified proposal, which deviated from the terms of the enabling resolution. Subsequent to the approval of the Referendum by the voters, the local sales tax was submitted for approval and approved by the Minnesota State Legislature.

10. Following the vote approving the modified ballot proposition, the City Council codified the result by passing another resolution, No. 2019-16, which provided for using the funding from the sales tax for "recreational amenities, a trail *system and* a Community Center."

11. The language of this measure, Ordinance No. 2019-16, deviated again from the previous resolution, as well as from the ballot proposition, by including **all** of the features with use of the conjunctive "*and*". (emphasis supplied).

12. The City Council also enacted Resolution No. 2019-58, which provided that it would not undertake the Project unless an additional $6 million was "raised" from private sources.

13. The aforesaid terms in the initial Resolution, the ballot proposition, and the subsequent Codification were ambiguous, deceptive, and misleading because of the various changes in terminology, as set forth above.

14. The Minnesota law in effect at the time of the above matter, Minn. Stat. § 297A.99, subd. 3(b), provided that local sales tax measures to be approved by voters,

must be "dedicated *exclusively* to payment of the costs of a *specific project which is designated*." (emphasis supplied).

15. The aforesaid ballot proposition, as approved by the voters in the City of Fairmont, did not conform to the statutory requirement as set forth above.

16. Nor has the City actually "raised" an additional $6 million from non-sales tax private funds as a condition for the "Project". As of November 2, 2023 the funds "raised" were reported to be $120,000, about $5,800,000 less than the required amount.

17. In sum, the approval of the Project by the City was flawed because of (1) the differing terms in the Referendum compared with the prior and subsequent Resolutions; (2) the Referendum did not indicate that the funds to be raised would be dedicated to a specific designated project; and (3) the required $6 million in private funds has not been "raised."

18. The Project has not yet been implemented.

19. The City of Fairmont adopted Resolution 2023-21 on June 12, 2023, with a Memorandum written by an outside law firm dated May 3, 2023, which is commonly known as the "Memorandum of Intent" ("MOI"). Resolution 2023-21 gives preliminary approval to Fairmont Area Community Center Inc ("FACC"), a Minnesota nonprofit corporation, to submit an application to the U.S. Department of Treasury under the Federal New Market Tax Credit (NMTC) program, which is part of the Community Renewal Tax Relief Act of 2000, as amended, 26 U.S.C. § 45D, which is incorporated in the Consolidated Appropriations Act of 2001 which is intended to stimulate private development projects.

20. Under the NMTC, only *private* individuals and *corporate* taxpayers are entitled to income tax credits for certified projects, which is consistent with the underlying statutory purpose of encouraging revenue investments from the private sector.

21. The arrangement devised by the City to construct the Project has changed over time. Section 1 of the MOI now contemplates that Mayo Clinic, the owner of the real estate on which the Community Center is intended to be built, will donate the land to a yet-to-be-determined entity affiliated with FACC and commonly referenced as the "Fairmont Area Community Center Holding Co." ("FACC Holding"). FACC Holding will then lease the real estate to the City for an undetermined amount of time; and the City will then permit the Project to be built by FACC Holding, in competition with private enterprises in the City.

22. The MOI states that the City had spent or committed $2,085,260 of the $15,000,000 local sales tax prior to May 3, 2023 for projects unrelated to the Community Center and had already spent $243,198.28 on the Project. Thus, the remaining amount of $12,671,541.72 is the maximum amount that the City has to contribute to the Project (the "Remaining City Contribution").

23. The $2,085,260 in the MOI which the City has already committed to spend consists of $1,935,260 which the City has dedicated to improvements at the local ice arena for ice compressor equipment that it plans to transfer to the Community Center in Phase 2 of the Project and $150,000 which the City has spent on a dock and boat ramp for its Amber Lake public recreation area. As a result, only $150,000, or 1.0% of the $15,000,000, has been allocated by the City to improvements other than the Community Center. This

distribution of 1.0% for recreational amenities, 0% for a trail system, and 99.0% for the Community Center is contrary to the voters' reasonable expectation that the local sales tax revenue would be more equitably distributed between "recreational amenities, a trail system and a Community Center" as stated in Resolution 2019-16.

24. The City has clearly stated its intention of abdicating its role in the Project and its intent to breach its fiduciary duty concerning the local sales tax. Although the Referendum presented the Project as a public works project, and the voters approved it as such, Section 2 of the MOI states "To finance the construction of the community center by FACC Holding, the City would grant the Remaining City Contribution less additional community center expenses incurred and paid by the City prior to the assignment of the contracts and the City's costs related to the NMTC structure to FACC (the "Grant")." Under this statement, the local sales tax revenues and any funds the City intends to raise through one or more bonds, will be granted to FACC or its affiliates. This is contrary to the voters' reasonable expectation that the local sales tax proceeds and the Project would be administered by the City.

25. Section 4 of the MOI states, "The construction of the project would completely be the obligation of FACC Holding". Section 5 states "After construction, FACC Holding would be responsible for maintenance and operation of the community center…." It is clear that the City is contributing the local sales tax revenue and bond proceeds to FACC or its affiliated FACC Holding or other such entities in order to induce FACC or its affiliates to build, maintain, and operate the Project. This is contrary to the voters'

reasonable expectation that the Project would be built, maintained, and operated by the City.

26. FACC is, and, on information and belief, FACC Holding will be, a private entity which will own and operate the proposed Community Center as evidenced by the statement in Section 3 of the MOI that the terms and conditions of the grant of the local sales tax revenue would include "…the City having a right of first offer to purchase the community center…." This is contrary to the voters' reasonable expectation that the Project would be owned by the City and become a significant asset for the taxpayers.

27. The City Council has a document titled "Fairmont Community Center – Phase 1 YMCA Financial Plan" (the "Plan") which was attached to the MOI and shows a convoluted arrangement for the intended use of NMTC tax credits. Under the Plan, the NMTC tax credits are to first be transferred from an entity called the "Tax Credit Investor" (TCI) into a for-profit Investment Fund which is 100% owned by the TCI where it is co-mingled with local sales tax revenue and private donor funds (the "Co-mingled NMTC Funds"); the Co-mingled NMTC Funds are then to be loaned at interest to a for-profit entity called the "Sub-CDE" which is 99% owned by the TCI before the funds are finally loaned at interest by the Sub-CDE to FACC Holding under two separate financial instruments titled "Loan A" and "Loan B".

28. The Plan also references the provision of certain put and call option rights to an unidentified individual or entity which would permit such an option holder the right to obtain or sell some to-be-determined direct or indirect interest in and to the Project. While the additional details on this arrangement have not been publicly explained, the complexity

introduced by the arrangement was certainly not disclosed to voters prior to approving the Referendum and would seem to directly contradict the reasonable expectations of voters that their tax dollar investment into the Community Center would be owned and managed by the City to secure a long-term and significant asset for the Fairmont community.

29. The City Council has approved an application for NMTC status. In doing so, two of the five members of the City Council, who both voted in favor of the application, have conflicts of interest. One member, Jay Maynard, has made financial contributions to FACC for the Project and is prominently displayed with his contribution amount of $10,000.00 on its website as a supporter of the Project, and another member, Britney Kawecki, is married to Brian Kawecki, an APRN (advanced practice registered nurse) and CRNA (certified registered nurse anesthetist) employed by the Mayo Clinic Health System Hospital in the City of Fairmont, which plans to donate the land for the Project and has pledged $500,000 to the FACC and other benefits for construction of the Project, owing it an economic interest therein. Additionally, the Mayo Clinic Health System ("Mayo") has a seat on the FACC Board which is currently held by Mayo's site administrator for its Fairmont Hospital location, Amy Long.

30. Councilmember Maynard was sworn into office on January 9, 2023. Since that date the City Council has voted on ten motions and resolutions regarding the Project. Councilmember Maynard cast all ten of his votes in favor of forwarding the City and FACC agenda for the Project.

31. Councilmember Kawecki was sworn into office on January 7, 2021. Since that date, the City Council has voted on twenty-three motions and resolutions regarding the

Project. Councilmember Kawecki cast all twenty-three of her votes in favor of forwarding the City and FACC agenda for the Project.

32. The City's Resolution 2023-21, also gives preliminary approval to the transference of the Remaining City Contribution to FACC and FACC Holding and states its intent in Section 3 of entering into "one or more agreements with FACC" without issuing a Request for Proposal ("RFP") in direct violation of Minnesota Statute §471.345, Subd.3. The statute states, in part, that "If the amount of the contract is estimated to exceed $175,000, sealed bids shall be solicited by public notice in the manner and subject to the requirements of the law governing contracts by the particular municipality." The Remaining City Contribution of $12,671,541.72 far exceeds the limit at which an RFP is required.

33. The MOI states that the City Council has already spent $243,198.28 on the Project, largely on engineering designs and plans that were crafted according to specifications that FACC provided to Bolton & Menk, JLG Architects, and other engineering and architectural firms hired by the City for the Project, creating a situation in which the City has allowed FACC to become the *de facto* organizational lead on the design process without the City conducting an RFP. On November 1, 2023, in a Joint Working Session between the FACC and the City titled the "Community Center Design Work Session", FACC Board member, John Kasper, described this as FACC being "assigned responsibility for the design" by the City.

34. The transference of local sales tax revenue to FACC and FACC Holding under Resolution 2023-21 constitutes a violation of Minnesota Statute § 297A.99 (Subd.1a)

which requires local sales taxes to be used for capital projects which are defined in Minn. Stat. § 475.521(b) as "public lands, buildings or other improvements".

35.   At the Community Center Design Work Session, Brandon Edmundson of the law firm Krahmer, Shaffer, & Edmundson, Ltd., a FACC Advisory Board member and FACC's liaison with the City, informed the public that the contractual documents between the City and FACC were being drafted and would be presented to the City Council for approval.  He stated that once the documents were signed, they would bind the City to transfer the Remaining City Contribution to FACC.

36.   Citizens and taxpayers of Fairmont have exhausted their appeal process.  While opposition to the Project has a long history, in 2022 and 2023 alone, citizens and taxpayers attended twenty-one City Council meetings and addressed the City Council in fifty separate three-minute speeches voicing their concerns.  Upon the request of the City and City Council members, they have formally presented alternative community center project options to the City Council.  They have called and emailed City Council members in an effort to be heard and written letters which have been published in the Sentinel, the City's official newspaper, without results.  The City has not addressed their concerns and is moving forward with the NMTC application process in order to fund the Project.

## COUNT I.  FEDERAL DUE PROCESS OF LAW

37.   Plaintiff realleges and incorporates the above allegations as though fully set forth herein, and states as follows.

38. The proposition approved in the Referendum, as set forth in Paragraphs 6 - 9, above, is ambiguous, confusing, and subject to variations in terminology that was deceptive and misleading to the voters.

39. Numerous voters were confused or misled by the language in the Referendum, which tainted the process.

40. The ambiguous, confusing, deceptive, and misleading language and changes thereof in the Referendum approved by the voters was fundamentally unfair.

41. The Referendum was undertaken by the City acting under the color of state law.

42. As a result of the aforesaid deficiencies in the Referendum and other improprieties described above concerning the "Project" and any implementation of it constitutes a violation of Plaintiff's right to Due Process of Law under the 14th Amendment of the U.S. Constitution.

43. The aforesaid conduct by Defendant City constitutes a deprivation of the Constitutional rights of Plaintiff and its members.

44. The aforesaid conduct by Defendant City constitutes a violation of the Federal Civil Rights Act, 42 U.S.C. § 1983.

45. The aforesaid conduct by Defendant City is continuing in nature and is irreparable.

46. As a result of the above, Plaintiff is entitled to an Order enjoining and restraining the implementation of the Project, together with its reasonable attorney's fees and costs incurred herein, pursuant to 42 U.S.C. § 1988.

## COUNT II.  STATE DUE PROCESS OF LAW

47. Plaintiff realleges and incorporates the above allegations as though fully set forth herein, and states as follows:

48. The aforesaid conduct by Defendant City constitutes a violation of the Due Process clause of Article I, § 7 of the Minnesota state Constitution.

49. The aforesaid conduct by Defendant City is continuing in nature and is irreparable.

50. As a result of the above, Plaintiff is entitled to an Order enjoining and restraining the implementation of the Project.

## COUNT III:  VIOLATION OF MINNESOTA § 297A.99, SUBD. 1(b)

51. Plaintiff realleges and incorporates the above allegations as though fully set forth herein, and states as follows:

52. Minn. Stat. § 297A.99 provides various requirements for imposition of a local sales tax by the City, including that the proceeds of the tax be dedicated exclusively to a "specific capital improvement … designated at least 90 days" before the referendum is enacted.

53. The City has not complied with the aforesaid requirement.

54. Accordingly, the sales tax and the "Project" that will use its proceeds are contrary to law and invalid.

55. The aforesaid conduct by Defendant City is continuing in nature and is irreparable.

56. As a result of the above, Plaintiff is entitled to an Order enjoining and restraining the implementation of the "Project".

### COUNT IV: DECLARATORY JUDGMENT UNDER STATE LAW

57. Plaintiff realleges and incorporates the above allegations as though fully set forth herein, and states as follows:

58. A real and genuine dispute exists between the parties regarding the sales tax and the "Project".

59. This Court has authority to construe the rights and obligations of the parties under the Minnesota Uniform Declaratory Judgments Act, Minn. Stat. § 555.01.

60. By reason of the above, the Court should adjudge and declare the sales tax null and void and that the receipts of it may not be used for the "Project".

### COUNT V: DECLARATORY JUDGMENT UNDER FEDERAL LAW

61. Plaintiff realleges and incorporates the above allegations as though fully set forth herein, and states as follows:

62. A real and genuine dispute exists between the parties regarding the sales tax and the "Project".

63. This Court has authority to construe the rights and obligations of the parties under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

64. By reason of the above, the Court should adjudge and declare the sales tax null and void and that the receipts of it may not be used for the "Project".

**WHEREFORE**, Plaintiff requests the following relief:

a. An Order declaring and adjudging the sales tax and "Project" null and void.

b. An Order enjoining and restraining any implementation of the Project.

c. Awarding to Plaintiff its reasonable attorney's fees and expenses incurred in this litigation, including attorney, costs and disbursements herein, pursuant to 42 U.S.C. § 1988.

d. Awarding to Plaintiff all other common law and statutory relief to which they are entitled.

**MEYER NJUS TANICK, PA**

Dated: November 29, 2023   By: /s/ David M. Robbins
Marshall H. Tanick, ID # 0108303
David M. Robbins, ID #0396681
330 Second Ave South
Suite 350
Minneapolis, MN 55401
Telephone: (612) 341-2181
Facsimile: (612) 337-5894
Email: mtanick@meyernjus.com
drobbins@meyernjus.com

**ATTORNEYS FOR PLAINTIFF
FAIRMONT TAXPAYERS COALITION
FOR GOVERNMENT TRANSPARENCY**